I'm going to mess up your name. Is it Ray Shack? Ray Shack, Your Honor. It's like Radio Shack without the DL. Okay. Say it one more time for me. I'm sorry. Ray Shack. Okay. Ray Shack. Thank you, Your Honor. I'm Rene Ray Shack. I represent the plaintiffs' appellants. She's making really bad puns up here. Go ahead. Okay. I represent the plaintiffs' appellants. The Zahner case is moot, so this concerns the Claypool and Zahner case. There's really three issues in this case, Your Honors. One is whether an annuity that has a substantially shorter term than someone's life expectancy is to be considered a transfer of assets, which would disqualify you from Medicaid. Let me try to work through piece by piece. It seems to me that, well, and the opponent may dispute this, but it does seem that under the regs, the government does allow for some sheltering of resources, and I think one of the amicus briefs makes the point that one financial planner in the right mind would not consider some sheltering of assets for Medicare purposes. So maybe the extent to which sheltering is permissible both by DPW considerations and federal regulations. Because I look at these annuities. Even if we set aside the $1,000 startup fee, there was some gain, but it was minuscule, de minimis even, almost a wash. If you add in the $1,000 startup cost, and I understand it's your position that that should not be added in, but if we add that in, it's out of law. So it seems to me the only reason, given the justification for getting the annuities, is to shelter resources from Medicare eligibility. Well, there's no question that these annuities were purchased as part of a Medicaid plan. The plaintiffs, we've conceded that on the law. And there's nothing wrong with that, by the way. And that's also our position is that, in fact, it's what the law permits. And, indeed, most recently in May, the Government Accountability Office issued a report about Medicaid planning at the request of Congressman Issa and his committee. And they did a survey and concluded that it was not a very great problem. But to the point of this case, they said that there are limits on how long, how far out an annuity can go. But there are no other limits. Well, I don't know about that. I mean, the transmittal of 64 or whatever it is said, you know, it has to be commensurate with and coincide with life expectancy. And here you have 17 percent and 10 percent. How is that commensurate with or coincide with life expectancy? Well, in fact, when you look at transmittal 64, the example that they gave of what was an actuarially sound annuity was one that had a term of approximately two-thirds of the. . . Two-thirds is different from 10 percent or 17 percent. Well, but the point, I believe, Your Honor, is that if you go back to the issuance of transmittal 64, what Congress was concerned about and what transmittal 64 was concerned about was, and this is reflected in the amicus brief of the National Academy of Elder Law Attorneys, was annuities that were too long. It was a situation in which you would have someone who had a six-year life expectancy and they brought a 20-year annuity. Yeah, because they're sheltering. They're just getting that big chunk of money out. And it was clear that that was going to, you know, barring some extraordinary actuarial event, that was, you know, most of that money was going to go to the remainder beneficiaries, probably the children. And so Congress said, no, we're not going to permit annuities to go beyond the life expectancy. But they didn't say that. They didn't say we were going to prohibit. It was an example, and the exact language they used is coincide with and commensurate with. And that's really what we have before us, that test. That is a test as to the purpose. And how do we measure that? Coincide with? And commensurate with. I mean, it's going to be a case-by-case basis, but I'm having difficulty with 17 percent and 10 percent as fitting within that category of commensurate, coincide. Well, again, because we think if you go back to the history of why this phrase was adopted, it was in the context of annuities that were too long. And there was no concern about annuities that were short, too short. And where, in fact, does that test get drawn? I mean, is it what the district court referred to as a sniff test? Congress, you know. Well, it's probably afforded. Yeah, Congress has raised it in some sense. Part of it is the roof floor, an annuity of one month. If you could technically cost an annuity, would that be okay? If it were, there are apparently two months of annuities. But the question is, that really should be something that either Congress or possibly the Centers for Medicare and Medicaid Services should address. It shouldn't be done on some case-by-case basis where, according to the Commonwealth, two years apparently is okay because they view the phrase term of years and say, well, that's plural. So two years is okay, but 18 months is not. I mean, there would have to be, we believe, from Congress a specification about what this rule is, and there simply is none. I mean, you can look and there is nothing that says an annuity that is too short fails the test. It's just not there. Well, unless you construe the words coincide with or commensurate as compared to could have said does not exceed. But, again, if you look at the context of when that was written in 1993, it is clear that the concern that was being evidenced in the interpretations in Transmental 64 of the state Medicaid manual was these two long annuities. It was not shorter annuities. It just simply wasn't even on the radar screen. Well, and we can ask your opposing counsel as to why shorter annuities would be problematic. I'm curious about the preemption issue with respect to the Pennsylvania law. Pennsylvania does not, as such, or you can answer this question, does Pennsylvania impose a stricter eligibility requirement than exists under the federal law? Yes, because the Pennsylvania Statute 441.6 says that if you are applying for Medicaid, your annuity is void and will be treated as a resource. Well, one of the factors that Medicaid imposes would not be met by virtue of the Pennsylvania law. But is that the same as if Pennsylvania said, oh, and in addition to these five factors, we are going to require under Pennsylvania that, you know, there's an additional bell and whistle in order for your annuity to qualify. Would you say they are the same? Well, now I guess I have to, I apologize for getting into deep Medicaid law, but there is a concept. You brought us into it. You may as well join us. Yeah, we're there. There is a concept in the Medicaid statute. It's in 1396A10C3I, I believe. 1396 is Medicaid. It's in 1396A10C3I. And it's been discussed in the cases about annuities. I'm surprised I didn't know that. In the Lopes case in the Second Circuit and in the Guestin case in the Eighth Circuit, the concept is that Medicaid eligibility is tied into and can be no more restrictive than eligibility for supplemental security income. That's called SSI. And the SSI program certainly has no restriction like what Pennsylvania imposes. And when you get SSI, you get Medicaid. When you get SSI, you get Medicaid with it. It's not a restriction that applies to Medicare and annuities, et cetera, et cetera. It is a provision of the law that says the inalienability of certain things renders them void as a matter of law. So it doesn't impose a new restriction on Medicare. It just says, oh, by the way, you know these factors that you have to click off if your annuity qualifies? Well, in Pennsylvania, it's not going to click. Well, I guess I would suggest that it's similar to what Pennsylvania tried unsuccessfully to do in the Lewis case recently. And if you go back to Lewis, which involved the use of what are called pooled trusts, if a charity can hold money in a trust for an individual who is disabled and who is getting Medicaid or SSI, and the federal statute is quite terse. It says there can be such a trust, and when the individual dies, the state will be repaid to the extent the charity doesn't keep the money. Well, not surprisingly, the charities want to keep the money. And Pennsylvania had all sorts of arguments about why that was. You're ignoring questions that we're asking you. You usually respond to our questions by raising your voice and continuing to say what you're trying to say. Maybe you could just get yourself to pause when you get a question, even though it might be a very rude interruption of your presentation. It's kind of sometimes they pay us to do that. Thank you, Your Honor. And just because Judge Slover just had a question for you. Do you want to try it again? No. You beat her down. That's not easy to do. I will look at Lewis and see what I can find in there. So I think if you look at Lewis, you see a statute to which at the federal level was very terse, very limited, and the court described it as comprehensive and directive, and therefore the state's efforts in many ways to regulate those trusts were struck down by this court. And I think, frankly, the Deficit Reduction Act provisions about annuities that are at the heart of this case are much more explicit and directive of what the state can and cannot do than was the situation in Lewis. And so that's why we do believe that 441.6 is preempted, Your Honor. How does the ‑‑ I mean, what happens here is you're using an annuity that doesn't qualify. Does it increase the penalty period, actually? The penalty period results from gifting. And so in these cases, there had been gifts, not through an annuity, but just outright gifts to children. And then that results in a penalty period of, let's say, a year, to make the example simple. How do you pay the nursing home during that year? And the way that is done is through your income, part of which is from your Social Security and any pension you might have, and part of which is from payments from the annuity. And so what the state has said is, no, no, no. Not only are we going to count the outright gifts to the children, which are not in dispute, but in addition, we're going to say that this annuity is also a transfer of assets, even though the money is going back to the annuitant and being used to pay for her cost of care. But isn't that the very problem, why a short annuity is not permissible? Because it's nothing more, especially with a return like this, it's nothing more than putting cash under the mattress. Well, the return, I would submit, Your Honors, is the result, unfortunately, of the state of the American economy and interest rates, which are virtually nil. One percent, two percent. When you buy an annuity, though, you're contacting for a certain return. It's not like you're buying an index fund with it. No. But it certainly reflects, there was a time, certainly, when annuities would have paid substantially more than the annuities did here, just because of the nature of the interest market. So the state is really saying, in addition to the outright gifts, which are not in dispute, we're going to treat this as a transfer. And in addition, even though you get all of the money back, we're not going to give you any credit for the money that you got back, notwithstanding that, as the record reflects, in one situation there was actual return of a gift, and the county reduced the penalty by 71.99 days. It was a partial return of the gift. The DPWA regulations permit that. In this instance, they're treating the entire value of the annuity as a transfer, even though, in fact, you're getting it back plus a teeny bit of interest. If you did put your money in cash under the mattress, let's say you spent $30,000 for your annuity, but instead of that you put $30,000 under your mattress, you wouldn't really be able to keep that $30,000, would you? No, you would not. That would be a resource, Your Honor. If they found out about it. Well, then you'd be obligated, obviously, to tell them. And, frankly, Attorney Scales and myself and Attorney Callanan, who wrote the NALA brief and is here, would not submit an application like that as part of a Medicaid application. But to some extent, Your Honor, that really is sort of like the argument that was made by the states and rejected in the Second Circuit in the Lopes case and in the Eighth Circuit in the Guestin case, where the argument was that, well, what purports to be a stream of income is really a resource. And all of the appellate cases, save an intermediate appellate court decision from New Jersey, but every federal appellate case and every other state appellate case has rejected that notion. And so if you simply have it under the mattress or in a bank account or wherever, it's clearly a resource. But if it has been placed into a stream, a monthly income stream through an annuity with a- That looks and smells like an investment. Isn't that right? It is a type of investment, yes, Your Honor. Well, you're arguing that, and maybe it's not this simple, but I'd love to think it's this simple, that if the investment, I'll call it that, I don't mean investment in the technical sense, satisfies the foreclosure of 1396P, whatever all those subparts are, in terms of an alien ability, who the contingent remainder person is, those four requirements. If it satisfies those four requirements, the federal government has made a decision that it shall not be counted as a resource. Is your argument that simple? That's correct, Your Honor. But the actuarial soundness makes it complicated. Would you agree? I don't think it makes it complicated because I think these are actuarially sound because the term is not longer than the life expectancy. That's what actuarial soundness means. You are arguing that all of the annuities should be excluded. Is that right? Yes. And what's wrong with the government's position that some of them should be included but not all? Well, their position, I believe, Your Honor, at least on the cases that are before you, is that they should all be included. Included. And there were others for the Zaners that were five-year met life annuities. Those, because they have longer terms, apparently were okay, at least for that reason, and there were some other objections the state raised which the lower court rejected. But, again, I think it points to the problem of not having this be something that is left in the hands of the specific definitions of Congress. As we pointed out in our brief, if you have $500,000, let's say, and you give $250,000 to your children and you purchase an annuity to pay for the nursing home for the three years or so that you won't have Medicaid, that annuity is going to be for a period of about three years. And presumably that would satisfy whatever test the Department of Public Welfare believes there is. Depending on life expectancy, right? Pardon? Depending on life expectancy. Well, they seem to say that two years is okay, and less than two years is not. They can make that argument that years, it's a term of years, there has to be at least two. That makes sense. There is some disconnect here. I'm beginning to end this. Maybe what it's doing is penalizing people who don't have a lot of money. They can only afford a one-year annuity as compared to the people who can afford an annuity that's 80% of their life expectancy. Exactly, Your Honor. That's really the inequity in the argument made by the DDW. So if you have more modest means, you end up inevitably with an annuity that is... Poor people get hit all the time. They do, but Congress didn't do that, Your Honor. It's the DPW that did, and Congress gets to write the rules. Have you tried to get this regulation changed so that the word coincide with and commensurate isn't there, so it's something that allows something more modest like what you have here? Congress has struggled with these issues throughout the years, and there were changes in 1993 and then again in 2006. It seems like what we're going to do is invalidate a lot of the practice. I mean, if we were to say that, if we were to go strictly along the coincide with, commensurate with, and find that that's controlling and look at the percentages here, we'd be outlawing a lot of what's going on in Medicaid planning. Is that correct? That's correct, and which Congress is certainly aware of. Again, what we mean by actuarial sound, we could do it in a way that defined actuarial sound and commensurate as intending a result where as long as the reasonable life expectancy of the annuitant was longer than the period of the annuity, then it's actuarial sound, and then the other three provisions of the statute click in, and then it's easy. That's right. That's easy, and that's, we believe, what Congress meant. But that seems to ignore what I think is the language of coincide with and commensurate with. Well, but the coincide and commensurate with, Your Honor, were in fact from the prior iteration of this back in 1993. But nothing has been done to, I mean, it's relied upon. Are you saying the district court shouldn't have relied upon it? We're saying that it is not controlling. It certainly is not entitled to anything more than the standard deference. It defines actuarially sound. Has actuarially sound been defined in a different way since then? It has not been defined at all by the administrative agency, by Centers for Medicare and Medicaid Services, and it hasn't been defined by Congress. Maybe they need a little bit more understanding of exactly what it means. I'm not sure. All right. We'll have time. Thank you, Mr. Regev. Did you reserve time? I did. I reserved three minutes. Do you want me to address any of the other issues or do that in rebuttal, Your Honor? Maybe in rebuttal. All right. Thank you, Your Honor. Good morning, Your Honors. My name is Jason Mann, and I represent the Secretary of Public Welfare. Are you here to help us? Yes. I'm from the government, and I'm here to help you. That's what I was going to say. I was counsel below as Deputy Counsel for the Department. I have since no longer a state lawyer registering to do this case, just so the record is understanding. You'll see me below. You'll see me here. This is a half-a-loaf gifting case. Well, you say that. Okay. How does a sniff test work? Let me explain half-a-loaf gifting first, because half-a-loaf gifting should make this case a lot easier to decide. I've explained the concept of half-a-loaf gifting in the brief. You're the people who are supposed to be asking the questions, but let me ask you. Do you understand half-a-loaf gifting, what that is? Why don't you give me a callus? Half-a-loaf gifting was a Medicaid planning technique. That was, in effect, up until the Deficit Reduction Act of 2006. What a Medicaid planner would do would be to you have a person who needs to go into a nursing home. They have a pool of money, and they want to shelter it. They would take half that money roughly. And there's nothing wrong with wanting to shelter. There was nothing wrong with that. There was nothing wrong with that. They would take half of that money, and they would give it to their kids or their relatives or whomever, and then they would use the half that was remaining to pay for the penalty period. When you make gifts into Medicaid, there's a penalty period. That would pay for the penalty period. In 2006, the same statute that created the safe harbor for certain types of annuities also shut down half-a-loaf gifting. And the way it shut down half-a-loaf gifting was to say the penalty period will not commence so long as you hold the half-a-loaf. You cannot hold the half-a-loaf. Fine. Thereupon began a search for straw men. How could we? Back up and say that again. The penalty period will not commence so long as the client holds the half-a-loaf to pay the penalty period. Okay. In layman's terms, what does that mean? That means that half-a-loaf gifting doesn't work anymore because you can't – well, we'll get into whether it still works. But it wouldn't work as previously used because if you retained the half-a-loaf to pay for the penalty period, the penalty period wouldn't commence. Wouldn't you use half-a-loaf to pay for the community spouse? No. That would defeat the purpose of half-a-loaf gifting. The purpose of the – what's crucial to the – that Medicaid planning technique is that you have money put in reserve to pay for the nursing home bill during the penalty period. All right. Let's say you have $100,000. You give 50 to your children and you keep 50 in a bank account. Mm-hmm. So that you can pay – So the penalty generates, let's say, a 10-month penalty period, and you've maintained the other 50 to pay for your nursing home care during that penalty period. Right. In 2006, Congress amended the statute to say we won't let that penalty period begin until you are resource-eligible for Medicaid. In other words, if you're retaining the half-a-loaf to pay for the penalty period, the penalty period doesn't run yet. Right. So what we have here is an attempt to use short contracts, and they have to be short enough to cover the penalty period, and the payments have to be large enough to pay for the nursing home care, to have a third party hold that money so that you can – it won't count as being a resource, and someday there will be money to pay for the penalty period. That's what's going on. Why, though, if we look at the provision 1396Pc1Gii, which has the full – Oh, God. This is your area, not mine. I'm going to go to the statutory context so I can tell you what it means. Those are the four requirements. The contingent beneficiary, the remaining men can't be assignable, actuarial sound. F and G. That's the problem. That's the problem. Okay. And that the payments are equal during the period of annuity. No balloon payments. All right. Why is it – I'll come down to that. I will explain it to you because, first of all, both on the issue – what you're trying to do here, the touchstone of statutory instruction is the intent of Congress. So you have two intentions being – We did that. We did that. I know. So you have two contrary instructions. One is provide a safe harbor for these annuities, and the second is no half-a-loaf gifting. There is a third requirement, though I think you'd agree, that Congress did not – at least in the previous – didn't intend to prohibit all sheltering. No, of course not. Okay. Of course not. Okay. And what Judge Cohill did below was reconcile those two goals. He did not touch, notwithstanding the pleas to the contrary from the amici and from my opponents, he did not touch this Court's decision in James. He did not touch the district court decision in Weatherby. He did not disagree with the Lopes case. He does not, let's disagree, with the Geston case. The use of annuities, conventional investment annuities, five years, ten years, whatever, to convert resources into income, something that was approved by this Court, which with which we still disagree, in the James case is not touched here. What we are focusing on here – Well, you know something we can work with, though, because you built in the five-year, the ten-year terms very deliberately. How do we – and this is what I'm trying to get past this sniff test. There's got to be something that's workable, something where the law is relatively clear, so players know what the law is, so you know what the law is. And it seems to me that the simplest way to look at that is simply to say that as long as they're reasonable, and that complicates it, but the actuarially determined reasonable life expectancy of the annuitant is longer than the period of the annuity. So there's not going to be any transfer of funds upon death. The annuitant is going to get the money back. As long as that's the case, it is – and this is the third component, actuarially sound. Don't look any further. That way there's a very easy workable test. It doesn't get into some of the problems we get into if we start looking at whether or not it's a trust, a trust like because there's no fiduciary involvement when you have an annuity. So that doesn't work for me. And you've just repealed – you've done exactly what my opponents want you to do, which is repeal the prohibition on half a loaf gifting. You've brought it back. You've brought it back. That's what this device is. We don't have a regulatory statement that says there's no half a loaf gifting anymore. Work within the confines of Transmittal 64 or the test that we have to apply. Is the test coincide with and commensurate? Well, yes. No, we're not. Yes, yes. And what does that mean? Why isn't that a year, two years, three years? Let me break it down. Okay. I mean, I said the first thing is you're trying to reconcile two congressional purposes here. One is – You keep throwing some of the blame on us. I know that because I don't want you to lose sight of half a loaf gifting. All right.  The first argument is, well, this isn't really an annuity. When Congress used the word annuity in FNG, okay, and it created the safe harbor for annuities, it had in mind investment products. And this is not an investment product. That's number one. Number two, it has to be actuarially sound. And Judge Rendell picked up on this right away. It's not a defined term. It comes out of Transmittal 64. I think Mr. Reischach made a mistake because in 2006 there was a state Medicaid director's letter that's in the record that came out after the DRA that says use the same definition of actuarially sound that we used to use in Transmittal 64. And Judge Rendell is right. Although everybody keeps on saying it simply needs to be shorter, it simply needs to be shorter, that comes from the example. It's an inexplicable example in my view because the rest of the Transmittal says, look at the purpose of the annuity. Its intent is to distinguish between bona fide retirement planning and abuses. You commensurate with the life expenses. It's twice in the Transmittal that it has to be coincide with and commensurate with. And it's the example that they've sieved off. But focus on that just a second because that's where I have a problem. You get into a situation which is not workable. It may well be that, well, if it's 80% of the reasonable life expectancy, then it coincides with its commensurate. If it's 70%, well, not so much. 40%, no. There's no way to draw the line there. I'm an administrative lawyer, Judge. Okay? And we have – in administrative law you have rulemaking by legislation and you have rulemaking by adjudication. And sometimes to get started you need to draw the bright lines. Okay? And, you know, I have a saying that I would give to the elder lawyers, pigs get fat and hogs get slaughtered. This was a bridge too far. I'm mixing my metaphors. This just went too far. I can't tell you where the precise line is because it hasn't been drawn by Congress and hasn't been drawn by HHS. The best we have is the line that Judge Rendell pointed out from the transmittal, which is inherently imprecise. But, I mean, I only want to get to my third mixed metaphor, which is I know it when I see it. This one was over the line. Well, at 17 and 10, if you really are applying the commensurate and they coincide with 17% and 10%, it's like we don't need to define where it is. That's exactly right. I can't tell you exactly where the line is, but that's over it. Now, let me tell you about this two-year thing because it can get a little bit confusing. What, the term of years? Again, you have a lot of tools in your appellate toolbox to get to the results here. One is, is it an annuity? And we have said if you're looking for a bright line test, use the term of years. Is that a slender read? Yes. But it's in the bulletin. It's textual. Okay. Two years is what we suggested is the definition of an annuity. Shorter than two years, it's not an annuity. Another test is, is it an investment? Does it return more than you paid in for the transaction? And contrary to my opponents, I do think you have to look at the entire transaction, the attorney fee you paid, the set-up fee you paid, what you're getting back. If you're spending more than what you're getting back, it's not an investment and it's not an annuity. The second way you can dispose of this is on actuarial soundness, which is Judge Rendell's approach. The third way you can approach this is on the trust-like device, which is what you get. Well, go back to actuarial soundness. You have to help me define what you mean, and that's where part of the problem is, that's where the ambiguity is. Well, it's an ambiguity, but as Judge Rendell said, whatever it means, it's not 17 percent and 10 percent. That is not commensurate. But the thing we'll write, we'll be writing for more than just 17 and 18 percent of the reasonable life expectancy. Well, I know. That's why I said you have a number of tools in your appellate toolbox. If you like certainty, you can go with, oh, it's not an annuity because it's shorter than two years. Or you can say it's not an annuity because it doesn't return more and leave the other cases for another day. Or we can say that it's longer than the period of the annuity. Pardon? Or we can say it's longer than the period of the annuity. Yes. I mean, you can rule the other side. I mean, the third way of dealing with it is a trust-like device. Now, I cannot understand why HHS said in its brief that the Secretary has not implemented that provision of law, which says that annuities can be treated as trusts, not that they are trusts, can be treated as if they were trusts, in accordance with standards established by the Secretary. I'm misquoting the statute slightly, but that's what it says. Why would we go there? Pardon? Why would we go there? Well, again, it brings you back to transmittal 64. It brings you back to not actuarial soundness, but the purpose of the annuity. It allows you to latch onto, well, this is a half-ago gifting transaction, not a retirement planning transaction. Let me ask you a question about the Pennsylvania law. Does that that imposes or renders one of the factors essentially void, making it impossible to have an annuity in Pennsylvania, does that restrict eligibility in such a way that it's not permissible? So that everybody in Pennsylvania. Well, I didn't hear the question. My answer, of course, is no. Of course it's permissible. But let me answer the question. Now I'm switching to the cross-appeal, where I'm saying that not that this particular transaction is just a bridge too far or whichever mix metaphor I'm using. Let's talk about preemption. Now, all of the annuity cases to date have assumed that non-assignable annuities are valid under state law. This is the first case where the state has said, oh, maybe not. And what we have done is we pointed to the Egger case below, in which the Supreme Court of Pennsylvania said that an anti-assignment provision in an insurance policy was invalid. And then on appeal to the court, and I admit it's the first time we've raised it, but it's something in the Uniform Commercial Code. I wish I'd talked to my wife before I wrote the brief. Judge Rendell will understand. Not about talking to your wife, but Uniform Commercial Code. Well, my wife teaches Uniform Commercial Code and bankruptcy. The Uniform Commercial Code, all the states will invalidate anti-assignment provisions in certain contexts. Well, the point is that if you're in Pennsylvania, your eligibility is restricted because you can't get the annuity that qualifies. Because we won't let you write into the exemption. We have a special statute that says, and whether or not it's a clarification of a general hostility against anti-assignment provisions or whether it's singling out Medicaid recipients, we can't tell you because at this point in time, all we know about Pennsylvania law is that we regulate in this area, all states regulate in this area, and that there are some instances of a hostility to anti-assignment provisions as void against public policy or void against the Uniform Commercial Code. So are those provisions permissible to restrict the availability of these annuities from Pennsylvania residents? Then you get into the question which I posed in the brief. Is the exemption for these annuities a mandate or an option? Is it up to the state to decide whether they will make these annuities available? Or is it congressional intent that the state must make these annuities available? And that's where you get into the Uniform Commercial Code provision because you have – it's not been settled what 9408 means. Some court – we do have the Pennsylvania Bankruptcy Court decision that says annuities are general intangibles. Would you bring them into that? Well, are you saying that 441.6, it's not clear whether or not that is inconsistent with federal policy? Absolutely. Because if it's an option, in other words, if Congress's intent was to say states have an option of making these annuities available within their states, and if the states allow these annuities under state law, then they are exempt, as opposed to the Congress saying you must make non-assignable annuities available within the state. Okay. It's clear enough to be unclear. Thank you very much, Your Honors. Do you have any more questions? No. Thank you. Thank you. Very briefly, hopefully, Your Honors. Judge Rendell, in response to your questions concerning Transmittal 64, I think the answer is – Hold on. Hold on. Has he told us who he is? Go ahead. Go ahead. Well, your opposing counsel said there's a state Medicaid director's letter that says use Transmittal 64. But the source of it is still Transmittal 64, Your Honor. Right. And I think the relevant language in Transmittal 64, which is at page A106 of the record, says, quote, if the individual is not reasonably expected to live longer than the guaranteed period of the annuity, the individual will not receive fair market value for the annuity based on the projected return. In this case, the annuity is not actuarially sound, and a transfer of assets for less than fair market value has taken place. So that was kind of what focuses my – maybe too simplistic, according to Mr. Mann's approach, that if it's poor fair market value, then that gets around some of the problems with what we mean by actuarially sound. If we look at poor market value in terms of the annuitant will be there because the annuitant's life expectancy is reasonably longer than the period of the annuity, then it seems to me that you're doubting all eyes and crossing all teeth. But I'm not as sure now as I was that that's the proper framework. Look at that. It was preceded by a sentence that says, use the following life expectancy tables. The average number of years of expected life remaining for the individual must coincide with the life of the annuity. Well, it perhaps in certain respects is not terribly well written, Your Honor. It's going to be. But I do think that, in fact, when you think about the underlying issue, the shorter the annuity, the more likely the money is actually going to be repaid to the individual, which is what TransMittal 64 was concerned about. Because particularly for folks who are in nursing homes, there's a life expectancy table, which is for everybody age 86. Those who are 86 and in a nursing home probably have a shorter life expectancy than the average 86-year-old. Just two other brief comments, Your Honors, or one other brief comment. Opposing counsel said, well, you have to count all of the transaction fees, not just the fee to the broker of $1,000 that he uses to reduce the return of the annuity, but the attorney's fees. I suppose that whatever was paid to Mr. Scales here for his legal work in this, the state would say, well, that comes out too. This is an unmanageable test, and it's not what Congress wrote. And that's like looking at the management fees when you decide what mutual fund to buy. You don't look at just the return on the investment in the fund. The fees are exorbitant. That's going to eat into your rate of return, and you factor that in. But if in the meantime mutual fund has to fend off some derivative action, that's totally different. I don't think he meant it to go that far. So I think that that's really a bridge too far, if you will, and that's part of the problem ultimately with the state's position, which is that there really is no test. The test is what Congress wrote. We believe, Your Honor, that Congress intended to say if you meet these criteria, your annuity is okay. If you don't, it's not. And that was the end of the matter. Thank you, Your Honor. Although even the language you cite from Trans-Mil-64 talks about a projected return. So you have to assume that you're getting something for it as compared to, you know, it would have been cheaper to just put it under the mattress. Well, you are getting something for it in these cases, not much, but you're getting something. Well, when you can count the fees, it's a negative return. Fair market value. But it's a fair market value transaction with a licensed Pennsylvania insurer. And once you start counting the fees, I mean, where does it end? The accountant who did the tax return? The attorney who gave you the advice? I don't know, Your Honor. So that's the problem. Thank you. Thank you. Thank you, Mr. Hicks. Thank you, Mr. Hicks. Any matter under advisement?